**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Benjamin Thomas Irwin and<br>Angela Marie Colasanti,<br><br>　　　Plaintiffs,<br><br>v.<br><br>Holt International Children's Services, Inc.,<br><br>　　　Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Benjamin Irwin ("Mr. Irwin") and Angela Colasanti ("Ms. Colasanti") (collectively, "Plaintiffs"), for their Complaint against Holt International Children's Services, Inc. ("Holt"), allege as follows. References herein to or allegations herein as to acts, conduct, or omissions of Holt are allegations that Holt's directors, officers, managers, employees, agents, representatives, and/or others engaged in the management of, direction of, and/or in control of Holt performed, authorized, supervised, and/or directed the alleged acts, attributable to Holt, while acting within the course and scope of their employment, agency, and/or authority.

## INTRODUCTION

1.　　Right now, a child from Thailand is stuck in a residential treatment facility in Langhorne, Pennsylvania, 9,000 miles from the place she was born. She has been there for twenty-one months. There is no plan for her discharge, placement, or long-term care. This case concerns the events that put her there, the adoption agency that repeatedly refused to take the necessary actions for her care, and the well-meaning family that has been harmed in the process.

1

2.	About eighteen years ago, Plaintiffs adopted a three-year-old girl from China. Wishing to adopt another child, the family saved up for roughly a decade and ultimately reached out to Holt, an international adoption agency, to begin the adoption process in early 2020.

3.	Holt eventually matched Mr. Irwin and Ms. Colasanti with K.R.[1], a then seven-year-old girl available for adoption through the Holt Thailand Special Needs Project. Holt represented to Plaintiffs and others that children available for adoption through that program, including K.R., "have minor to moderate physical or developmental special needs." While Plaintiffs had not yet had a chance to meet K.R., they were thrilled at the chance to make her a part of their family.

4.	But the international adoption process is often a slow one, even after a prospective family is matched with a child. During month fourteen of the family's wait, Ms. Colasanti wrote a reflective blog post that Holt reposted its website: "We, like other families in our agency, wake up each day hoping we will get the phone call that lets us know we can meet our child. Sadly, it has not yet come. Exhaustion and confusion are always close, while hope hangs on."

5.	That call to Plaintiffs came in 2023, but Plaintiffs' family had no way to know of the harrowing ordeal that would soon follow, which ultimately led to the disruption/termination of K.R.'s adoption/placement as set forth below.

6.	Plaintiffs and their previously adopted daughter arrived in Thailand on April 22, 2023. Two days later, they met K.R. for the first time. Thereafter, it became clear to Plaintiffs that Holt had misrepresented, omitted, and/or distorted key, material information about K.R., particularly concerning her medical, psychological and behavioral complications. During the

---

[1] To protect her identity as a minor child, and consistent with Fed. R. Civ. P. 5.2, K.R. is identified herein only by her initials.

roughly three-year period prior to their travel to Thailand, Plaintiffs made themselves abundantly clear to Holt—they could not accept a child that exhibited severe or dangerous behaviors, as they did not have the resources, skills, or capacity to care for such a child.

7.    Within those first few weeks that K.R. was with the family in Thailand, the child attempted to strangle Plaintiffs in front of their daughter, attempted to jump off an eleven-story hotel balcony, destroyed property, attempted to run away, and repeatedly engaged in self-harm. Indeed, K.R.'s behavior became so dangerous and extreme that the family could not safely be in public together, with the child eventually needing to be physically restrained by Holt social workers in front of Plaintiffs' family, understandably traumatizing Plaintiffs and their previously adopted daughter.

8.    All these events (and many others, including those to be discussed herein) were communicated to Holt in real time. In response, and fully aware of these many disturbing events and their harmful effects on Plaintiffs and their previously adopted daughter, Holt employees/agents instructed Plaintiffs to simply ignore K.R.'s behavior or otherwise downplayed the severity of the dangerous situation that was developing.

9.    To make matters worse, and while still in Thailand, when Plaintiffs voiced their concerns about their inability to care for K.R. (just as they had previously advised Holt of their lack of resources, skills, and capacity to care for a child such as K.R. who exhibited severe and dangerous behaviors), a Holt representative responded by urging the family that they were K.R.'s "last chance," "only hope," and other words to that effect.

10.    In an attempt to place guilt on Plaintiffs if they failed to proceed, Holt also told the family that, should they refuse to take K.R. back to the United States with them, she would have

to be returned to her orphanage, a place that Plaintiffs had already seen themselves, in person, to be a dangerous, unsanitary, abusive, and predatory environment for the child.

11.     Due to this pressure and coercion (and feeling morally obligated to give K.R. a chance at life in the United States after all this time), Plaintiffs and their daughter, with little to no help from Holt, made the difficult decision to sedate K.R., board their flights to the United States, and return home with the child.  In this process, Holt represented to Plaintiffs that if K.R. were brought to the United States, her adoption would need to be finalized in order to secure her immigration status.  These statements, however, were false, and were made in order to further pressure and coerce the family into accepting any and all responsibility for the child under any and all circumstances that may develop, regardless of K.R.'s or their own safety.

12.     But Plaintiffs' ordeal—as well as that of K.R.—had only just begun.  Over the next six months, the Irwin-Colasanti family and K.R. would endure numerous emergencies, hospital visits, daily extremely violent outbursts, as well as severe, previously undisclosed, and highly expensive medical and psychiatric diagnoses, which increased in intensity and degree.  Needless to say, this course of events practically destroyed Plaintiffs' emotional and financial well-being and re-traumatized their previously adopted daughter.

13.     Holt, on the other hand, refused to take action, even when informed by Plaintiffs of K.R.'s extreme behavior and diagnoses, and failed to provide any meaningful response to Plaintiffs' requests for Holt's assistance and support when the family and K.R. needed it most.  Ultimately, Plaintiffs had no choice but to terminate (or "disrupt") K.R.'s adoption/placement, which they did unequivocally on July 25, 2023.

14.     Now, Holt continues to delay and dodge responsibility while K.R. remains stuck in a residential treatment facility, leaving Mr. Irwin and Ms. Colasanti in limbo and furthering their extreme financial and emotional distress.

15.     Additionally, during the few occasions that Holt has engaged with Plaintiffs, Holt has taken the position that, pursuant to one of several contractual agreements, Plaintiffs remain exclusively financially responsible for K.R. unless and until Holt finds K.R. a permanent home even though, as Holt has acknowledged, Plaintiffs are not now and never have been K.R.'s guardians or adoptive parents.  Holt's position, however, is belied by the terms of the operative agreements, by federal statutes and regulations, by state law, by Article 21 of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, and by the official position of the Thai government, as well as by public policy.

16.     Plaintiffs have been left with no choice but to seek judicial intervention in these matters.  Justice demands that Holt pay for its abuse and exploitation of Plaintiffs, including Holt's numerous breaches of its duties to Plaintiffs (as well as Holt's egregious disregard of K.R.'s best interests).

## THE PARTIES

17.     Plaintiffs Benjamin Irwin and Angela Colasanti are and at all relevant times have been citizens and domiciliaries of the Commonwealth of Pennsylvania.

18.     Holt is a corporation organized and existing under the laws of Oregon with its principal place of business located in Eugene, Oregon.  Holt also maintains an office located in Bucks County, Pennsylvania, at 3466 Progress Drive, Bensalem, Pennsylvania 19020.  Given its regular, systematic, and extensive operations in Pennsylvania, Holt is registered to do business in this Commonwealth pursuant to 15 Pa. Cons. Stat. § 411(a).  Holt holds itself out to be the largest

international adoption agency in the world, operating in at least a dozen foreign countries and working with families in all fifty states.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because no Plaintiff is a citizen of the same state as any Defendant, and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

20.     This Court has personal jurisdiction over Holt, which is a corporation registered to do business in the Commonwealth of Pennsylvania pursuant to 15 Pa. Cons. Stat. § 411(a) and thereby subject to this Court's exercise of general in personam jurisdiction by consent under 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b).

21.     In addition, this Court's exercise of personal jurisdiction over Holt is proper under Pa. Cons. Stat. § 5322(b) because Holt engaged in intentional conduct directed towards the Commonwealth of Pennsylvania that has caused harm that Holt knew would likely be suffered by Plaintiffs in Pennsylvania.  On information and belief, Holt has committed tortious acts in Pennsylvania and this judicial district or has otherwise established contacts with Pennsylvania such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the Fourteenth Amendment.

22.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**FACTUAL ALLEGATIONS**

**A.    The International Adoption Landscape, Generally**

23.    The international adoption environment as it now exists began during the middle of the twentieth century, largely facilitated by religious organizations like Holt.

24.    In the 1980s and 1990s, international adoption in the U.S. and elsewhere became increasingly popular, as children affected by conflicts abroad were in need of homes.  This led to the introduction of the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (or "Hague Adoption Convention") in 1993.

25.    International adoption by U.S. families peaked around 2004, resulting in the international adoption of nearly 23,000 children in that year alone.[2]

26.    But as international adoptions increased, so too did concern regarding certain unethical practices of adoption agencies, including allegations of child trafficking, coercion, and fraud.  Accordingly, the United States ultimately ratified the Hague Adoption Convention in 2008. The Intercountry Adoption Act of 2000 ("IAA"), codified at 42 U.S.C. §§ 14901–14954, provides the statutory framework for U.S. implementation of the Hague Adoption Convention.

27.    Due in part to stricter regulations in "sending" countries and heightened scrutiny of unethical practices in the United States, the number of international adoptions has sharply decreased in recent years.  For example, "[w]here more than 12,700 children were adopted internationally in 2009, that figure has dropped to under 1,300 in 2023."[3]

---

[2] *See* Travel.State.Gov (DOS), *Adoption Statistics*, https://travel.state.gov/content/travel/en/Intercountry-Adoption/adopt_ref/adoption-statistics-esri.html?wcmmode=disabled (last visited Sept. 5, 2025).

[3] Anna Fleck, U.S. Adoptions From Abroad Are Declining, Statista, Nov. 22, 2024, https://www.statista.com/chart/33552/number-of-children-adopted-in-the-us-from-

28.     This trend has resulted in something of a perverse incentive structure for adoption agencies.  With the market for international adoptions contracting, international adoption agencies like Holt have become incentivized, for financial reasons, to place into adoptive homes children that would otherwise not be safe or suitable candidates for the vast majority of adoptive families due to the children's medical, psychological, or behavioral profiles.

**B.      The Irwin-Colasanti Family**

29.     Plaintiffs reside in Pottstown, Pennsylvania, with their now-twenty-one-year-old daughter.  Plaintiffs adopted their daughter from China when she was around three years old.

30.     Plaintiffs became well acquainted with various aspects of the international adoption process and its challenges through the adoption of their daughter, who had minor to moderate special needs.  Because they specifically requested a child with a cleft palate, Plaintiffs knew and understood that their daughter's adoption would involve navigating certain medical challenges. Like many adoptive children, Plaintiffs' adoptive daughter also exhibited signs of Reactive Attachment Disorder (RAD), developmental trauma, and anxiety.  Mr. Irwin and Ms. Colasanti were able to navigate those challenges successfully, bringing their daughter into their home and family in the way that any well-meaning, good-hearted adoptive parents hope to.

31.     Thus, Plaintiffs have at all relevant times been aware of the challenges posed by international adoption.  The adoption of their daughter provided them with extensive experience and training in managing the minor to moderate physical or developmental special needs and attachment therapy demands of adoptive children.

---

abroad/#:~:text=China%20stopped%20international%20adoptions%20during,intercountry%20ad options%20unless%20to%20blood (last visited Sept. 5, 2025).

### C.      Holt and its History of Abusive Practices

32.      Holt is the largest international adoption agency in the world.  Since its founding in 1955, the agency has placed roughly 45,000 children in homes throughout the United States.  In the 2021 fiscal year alone, Holt brought in nearly $6,000,000 in adoption fees, according to its IRS filings.

33.      While Holt has become synonymous with international adoption, it has also, in some circles, become synonymous with unethical and abusive practices.  Holt has gained notoriety in recent years for its history of abusive adoption practices involving children from South Korea.[4] For example, investigations have revealed that Holt facilitated the "adoption" of children that were not orphans at all, but rather had been taken from their families under false pretenses.[5]

34.      In response to the above-referenced reports, Holt has brushed these stories aside as merely "anecdotal," claiming that they "omit important context."  Still, in response to these reports, the agency has stated that "[u]nder no circumstances would [it] condone unethical or coercive activities in adoption" and that Holt's "commitment to respecting the rights of birth parents, adoptees and adoptive families remains unwavering."[6]

---

[4] *See generally* PBS Frontline, *South Korea's Adoption Reckoning* (Sep. 20, 2024) https://www.pbs.org/wgbh/frontline/documentary/south-koreas-adoption-reckoning/ (last visited Sept. 5, 2025) (indicating that Holt intentionally altered children's identities and misled or coerced birth mothers into relinquishing their children to the agency).

[5] *See, e.g.*, The Guardian, *'Korea is hiding our past': the adoptees searching for their families – and the truth* (Sep. 28, 2023) https://www.theguardian.com/global-development/2023/sep/28/korea-is-hiding-our-past-the-adoptees-searching-for-their-families-and-the-truth (last visited Sept. 5, 2025).

[6] Holtinternational.Org, Holt International Response to Recent Media About Korea Adoptions (Oct. 4, 2024), https://www.holtinternational.org/holt-international-response-to-recent-media-about-korea-adoptions/ (last visited Sept. 5, 2025).

35.    That supposed "commitment" was apparently short-lived.  With its abuses in South Korea presumably in its past, Holt's fraudulent and negligent practices have taken on a new form.  Now, the agency appears to frequently mislead prospective adoptive parents (such as Plaintiffs) about the medical, psychological, and behavioral profiles of the children (including K.R.) that those parents (including Plaintiffs) wish to adopt, putting both the children and families at extreme risk.

36.    Indeed, at the time of the filing of this Complaint, Plaintiffs are aware of *multiple families across the United States* that attempted to adopt a child through Holt, only to later discover that the child had severe medical, psychological, and/or behavioral complications that Holt misrepresented or failed to disclose.  Many of these cases also involve children from Holt's operation in Thailand and, in some cases, *from the exact same orphanage as K.R.*

37.    Couples in the United States hoping to adopt a child internationally are typically unable to meet the children with whom they have been "matched" until they have completed nearly all of the adoption/placement process.  This includes, as is Holt's practice, the required signing of various agreements drafted by Holt—done long before ever meeting the child, and with information about the child limited to that which Holt has chosen to provide.

38.    To facilitate its international adoption business, Holt establishes, controls, and/or collaborates with numerous foreign (or "in-country") subsidiary or related entities in order to identify or obtain information about prospective adoptive children.  Holt sometimes describes these entities in its promotional materials as "local partners" or, in its agreements, as "third parties."

39.    One such entity is the Holt Sahathai Foundation ("HSF") in Thailand.  HSF provides various services to impoverished and underserved children in Thailand, including foster

10

care, education, and welfare services. On its website, Holt refers to HSF as its "partner agency" with which it has a "longstanding relationship."[7]

40. HSF works very closely with Holt to place Thai children for adoption and reports directly to Holt concerning the biographical information of such children. On information and belief, HSF workers in Thailand are either employees or agents of Holt. Indeed, in each of its publicly available IRS Form 990s, Holt has represented that it maintains offices, employees, or agents outside the United States, including in Southeast Asia.

41. Additionally, Holt employees based in the United States routinely travel to Thailand to meet with and directly assess potential adoptees, as they did with respect to K.R. Such Holt employees first assessed K.R. in November of 2019.

42. According to social media posts of a former Holt employee who was on that trip, Holt staff "assessed" *156 children in Thailand over the course of just twelve days* during the staff's trip to Thailand in November 2019. Social media posts also indicate that the Holt employees responsible for assessing these children were given only "one day to rest" after arriving in Thailand, that they were made to "work[] nearly every waking hour of every day," and that one employee could "barely keep [her] eyes open" during the assessment process. Indeed, on the day K.R. was first "assessed" by Holt, the Holt employees awoke at 4:45 a.m. and "assessed" *eighteen children in a single day*.

---

[7] *See* Holtinternational.Org, *Children in Thailand are Waiting for Families* (Dec. 9, 2022), https://www.holtinternational.org/children-in-thailand-special-needs-project-are-waiting/ (last visited Sept. 5, 2025)

**D.      The Pre-Placement Process and Holt's Material Misrepresentations, Omissions and Failures**

43.      Plaintiffs first contacted Holt in February 2020 to inquire about Holt's international adoption programs.  Plaintiffs paused their adoption inquiry for a period of almost one year due to the Covid-19 pandemic.  Still wanting to pursue an adoption, Plaintiffs submitted an application to Holt and, on February 21, 2021, Holt acknowledged receipt of Plaintiffs' Application for Adoption.

44.      Holt then instructed Plaintiffs to sign an International Adoption Services Agreement (the "IASA"), drafted by Holt.  At that time, Plaintiffs had not been provided any information about K.R. (or any other child available for adoption through Holt).

45.      Plaintiffs signed Holt's IASA on February 23, 2021.  **Exhibit 1**.  The IASA imposed upon Plaintiffs and Holt various obligations with respect to any adoption conducted by Holt (including K.R.).  Specifically, among its relevant provisions, the IASA:

> i.      Imposed upon Holt the obligation to obtain and supply to Plaintiffs "available information" about K.R. *See id.* at ¶ 2.1;
>
> ii.      Stated that "[a]ll information obtained by Holt regarding [K.R.] . . . will be provided to" Plaintiffs.  *Id.* at ¶ 7.2;
>
> iii.      Stated that "Holt will make reasonable efforts to provide [Plaintiffs] with all available medical, psychological, historical, and other records and information concerning" K.R.  *Id.* at ¶ 20.6; and
>
> iv.      Stated that "Holt has provided [Plaintiffs] with a generic Placement Agreement substantially similar to the kind of agreement [Plaintiffs] will be required to sign upon acceptance of" K.R.'s child referral. *Id.* at ¶ 8.

46.      On March 9, 2021, and before Holt "matched" Plaintiffs with K.R., Plaintiffs completed Holt's "Thailand Special Needs Project Medical Checklist" to indicate the special needs

12

that Plaintiffs were willing to consider in their adoptive placement.  In this document, Plaintiffs included the word "NO" next to "Physical Abuse" and "Sexual Abuse" and the word "MAYBE" next to "Other Known Trauma."

47.     On or about March 13, 2021, Plaintiffs worked with Holt employee Zoila Lopez to review the children available on Holt's then-current "Waiting Child List."  Ms. Lopez declined to present one alternative available child in particular, citing concern that this particular alternative child's severe behavior would not be a good match for Plaintiffs.  Ms. Lopez did *not* raise any similar concerns with respect to K.R.  Plaintiffs justifiably relied on this omission or misrepresentation.

48.     On March 15, 2021, Holt provided Plaintiffs with a "Child's History" document dated January 30, 2020, which outlined certain biographical information about K.R.  **Exhibit 2**. This document was prepared by Zoila Lopez, a Holt employee that had traveled to Thailand and met with K.R.  *See ¶¶ 41-42 supra*.

49.     Among other things, K.R.'s Child History form indicated the following:

    i.    That K.R. had been diagnosed with ADHD and no other disorders, disabilities, or impairments;

    ii.    That K.R. was being given ADHD medication and no other medication;

    iii.    That K.R.'s records disclosed no history of physical or sexual abuse; and

    iv.    That K.R.'s behavior was consistent with that of other children her age.

50.     K.R. resided (since birth) at the Songkhla Children's Home, a government run orphanage in Songkhla, Thailand visited by both HSF and Holt staff, before being made available for adoption through Holt's Thailand Special Needs Project.  At all times relevant to this

13

Complaint, Holt represented that children available for adoption through Holt's Thailand Special Needs Project have "minor to moderate physical or developmental special needs."

51.     As part of K.R.'s information (received and relied upon by Plaintiffs), an internal Holt memo dated November 19, 2020, inquired about K.R.'s behaviors, medicinal interventions, and the results thereof.  Specifically, it requested information whether K.R.'s behavior improved with ADHD medication alone, whether K.R. was "defiant or destructive," whether K.R. was "extremely aggressive," and whether K.R. was "aggressive with adults."  HSF responded to Holt by stating, among other things, that K.R. "has [a] stable good temper."  **Exhibit 3**.  The memo also stated that "there is no hitting/fight [sic] with friends on her report after she receives medicine," which Plaintiffs later learned to be false.  *Id.*

52.     Based on the representations made by Holt regarding K.R. and Holt's Thailand Special Needs Project, and upon the absence of any references by Holt to severe or extreme psychological, physical, or medical conditions, Mr. Irwin and Ms. Colasanti decided to move forward and were delighted by the possibility of being able to adopt K.R.

53.     On March 26, 2021, Holt signed and provided to Plaintiffs a document entitled the "Holt Family Service Plan."  **Exhibit 4**.  The Holt Family Service Plan outlined Holt's obligations as "Primary Provider" with respect to custody and provision of childcare or other social services in the event of disruption of the adoption/placement process, namely, to "[w]hen necessary because of a disruption before final adoption, assum[e] custody of [the] child and provid[e] or facilitate[e] the provision of childcare or any other social service pending an alternative placement."  *Id.*  In direct contradiction of this representation, Holt would later assert (repeatedly) to Plaintiffs, various hospitals, Woods, and Chester County officials that Holt cannot take custody of K.R. because they are not licensed to do so in Pennsylvania.

14

54.    On April 7, 2021, Plaintiffs underwent mandatory psychological evaluations which revealed no psychological or mental health issues of any kind.

55.    On April 15, 2021, Plaintiffs reviewed K.R.'s file and medical history with physicians from the International Adoption Medicine Clinic at Children's Hospital of Philadelphia ("CHOP").

56.    Holt then completed the first "Home Study" of Plaintiffs' household on June 18, 2021.  As part of that home study, Plaintiffs explicitly informed Holt that they would not accept a child with severe behavioral challenges.  Plaintiffs also informed Holt, again, that any child with severe behavioral challenges would pose a great risk to and likely retraumatize their previously adopted daughter.  The home study included a list of special needs for which Plaintiffs were approved, which *did not include aggressive and/or dangerous behaviors nor severe psychiatric and medical conditions*.

57.    Holt approved Plaintiffs for K.R.'s adoption on June 18, 2021, and Plaintiffs accepted K.R.'s referral on June 22, 2021, understanding that K.R. may have minor to moderate physical or developmental special needs.  This referral document included neither information about aggressive and/or dangerous behaviors nor any indication of K.R.'s severe and extreme psychiatric and medical conditions.

58.    Thus, on June 24, 2021, Plaintiffs executed a Placement Agreement drafted by Holt. **Exhibit 5**.  The Placement Agreement provides, among its relevant provisions, that:

> i.    "Thailand Department of Children and Youth is and shall remain the legal guardian of the child at all times until adoption is finalized by [Plaintiffs] or until the child's present guardian consents in writing to transfer guardianship to some other person or entity." *Id.* at ¶ 4;
>
> ii.    "[Plaintiffs] may terminate this agreement at any time prior to finalization of adoption." *Id.* at ¶ 9.1.2;

iii.    "Termination of [the Placement Agreement] and/or disruption will terminate [Plaintiffs'] right to custody of the child. Holt will assume legal but not financial responsibility for transferring custody of the child from [Plaintiffs] and for finding appropriate substitute care for the child." *Id.* at ¶ 10.3;

iv.    In the event of disruption, "Holt will make reasonable efforts to find another adoptive placement for the child that is appropriate given the child's age, needs, and expressed wishes if any. If no adoptive placement seems likely or possible, Holt will explore other types of placements and resources for the child, including foster care and institutional care." *Id.* at ¶ 10.5; and

v.    "Disruption of the placement initiated by either party does not extinguish or affect [Plaintiffs'] financial obligations under [Paragraphs 6.1 – 6.7 of the Placement Agreement]." This paragraph also provides that Holt "may" offer to assume "some or all" of such financial obligations in exchange for Plaintiffs' payment of a "disruption fee" or "termination fee," but that "[Plaintiffs'] financial obligations under [the Placement Agreement] will continue until [Plaintiffs have] paid such termination fee and fully cooperated with Holt to achieve a satisfactory new placement for the child." *Id.* at ¶ 10.7.

59.    As indicated above, paragraph 10.5 of the Placement Agreement expressly provides that Holt, in the event of a disrupted placement, would "explore other types of placements and resources for the child, ***including foster care and institutional care***," (emphasis added). Holt, however, (on information and belief) is not licensed to provide foster care or institutional care services in Pennsylvania. Plaintiffs did not know, and had no reason to know, of this fact at the time that they entered into the Placement Agreement.

60.    The parties' execution of the Placement Agreement resulted in the automatic termination of the IASA. *See* IASA, **Ex. 1** at ¶¶ 8, 14.2. The Placement Agreement, however, expressly incorporates all provisions of the IASA. **Ex. 5** at ¶ 2.

61.     Moreover, paragraph 10.9 of the Placement Agreement provides that the dispute resolution and grievance procedure (*see* IASA, **Ex. 1** at ¶ 15) does not apply to "any disruption . . . of an adoptive placement" or to "any litigation or dispute with regard to custody or guardianship of the child that may arise out of any disruption or termination of [the Placement Agreement], and [Plaintiffs'] financial obligations with regard to the child."  Instead, such procedure applies only to claims "for damages attendant to or arising out of any disruption or termination of [the Placement Agreement]," as opposed to, for example, and as in the present action, claims for damages attendant to or arising out of the adoptive placement or disruption thereof.

62.     Holt's representation in the IASA that the agency had "provided [Plaintiffs] with a generic Placement Agreement substantially similar to the kind of agreement [Plaintiffs] will be required to sign upon acceptance of a child referral" was false.  *See* IASA, **Ex. 1** at ¶ 8 and Addendum B.

63.     The "sample" Placement Agreement attached as Addendum B to the IASA is/was applicable only to adoptions in "finalized" countries, not a "non-finalized" country like Thailand.[8] Accordingly, the sample Placement Agreement contained ***no provisions at all with respect to post-placement disruption procedures or responsibilities***.  Thus, the Sample Placement Agreement provided to Plaintiffs with the IASA was not "substantially similar" to the Placement Agreement Plaintiffs were ultimately "required" to sign.

---

[8] International adoptions in so-called "finalized" countries must be completed in the foreign country before the child can be placed with the prospective adopters.  Thailand, however, is a "non-finalized" country, meaning that the prospective adoptive parents return with the child to the U.S. to finalize the adoption domestically.  Additionally, Thailand requires a six-month probationary placement period, under the supervision of the relevant adoption agency (here, Holt), before a child's adoption can be finalized in the U.S.

64.    Under 22 C.F.R. § 96.50(f), the U.S. Department of State requires an agency like Holt to "include[] in the adoption services contract with the prospective adoptive parent(s) a plan describing the agency's or person's responsibilities if a placement for adoption is disrupted."  Such a plan must specifically address, among other things, "[w]ho will have legal and financial responsibility for transfer of custody in an emergency or in the case of impending disruption and for the care of the child."  *Id.*

65.    On June 22, 2021, Holt certified in writing that Holt would "assume responsibility to administer postplacement services from the time of [K.R.'s] preadoptive placement through [K.R.'s] legal adoption according to Thai and U.S. law."  **Exhibit 6**.  This document did not require Plaintiffs to finalize the adoption of K.R., nor did any other document signed by Plaintiffs, despite repeated verbal and written representations by Holt to the contrary.

66.    On June 30, 2021, Holt wrote a letter to the Thailand Department of Children and Youth ("DCY"), recommending Plaintiffs for the adoption of K.R.  That letter included a generalized list of special needs for which Mr. Irwin and Ms. Colasanti were approved, including: birth defects, blood abnormalities, central nervous system afflictions, developmental delays, skin conditions, orthopedic problems, and other *minor to moderate* medical challenges.  **Exhibit 7**.

67.    Absent from the June 2021 DCY letter—consistent with Holt's pattern of misrepresentations, omissions, and distortions—was any reference to severe or extreme psychological or behavioral challenges.

68.    On July 10, 2021, Holt issued to Plaintiffs its "Child Opinion Form" concerning K.R.  That document again indicated "NO" next to "Major Developmental Delay" and "NO" next to "Severe Emotional Needs."  It also included—*for the first time*—"YES" next to the item "Past Child Abuse, Known, Physical and Sexual."  This "YES," however, reflected only the possibility

18

of such abuse existing within K.R.'s biological family based on the information provided in her specific Child's History Form.  Plaintiffs, of course, did not wish to be excluded from adopting K.R. merely because of this vague possibility, especially in light of Holt's representation that K.R. did not have severe or extreme behavior issues.

69.    Later, Holt employee Celeste Snodgrass traveled to Songkhla and assessed K.R. on October 10, 2022.  In completing her assessment form following that visit, Ms. Snodgrass left several key portions of the "7-11 Years Assessment Tool" document blank.  Specifically, a question reading "Has child witnessed or been physically or sexually abused?" was not answered in the affirmative, but rather was left completely blank, despite previous reporting of such risk *within this specific orphanage*—abuse of which Holt was aware.

70.    This Holt assessment form again downplayed, misrepresented, and/or omitted any reference to K.R.'s severe and extreme aggressive behaviors and suggested that the child's supposedly minor behavioral complications were reduced or resolved by simple ADHD medication.  Indeed, the assessment specifically stated: "no aggressive behavior when she takes the medicine."

**E.    The Family's Experience in Thailand and Their First Experiences with K.R.'s Extreme Behavioral Complications**

71.    Plaintiffs arrived in Bangkok on April 22, 2023.  They planned to stay in Thailand until May 10, 2023.

72.    Upon arriving, Plaintiffs prepared their Bangkok hotel room for K.R., as they planned to travel to the Songkhla Children's Home orphanage the following day to meet K.R. and return to Bangkok with her thereafter.

73. On April 24, 2023, Plaintiffs traveled to Songkhla Children's Home in the Songkhla Province, accompanied by Wanida "Mo" Noinongyao, the director of HSF's adoption program. While there, Plaintiffs met K.R. and, thereafter, were introduced to K.R.'s concerning behavior.

74. Plaintiffs first noticed that K.R. frequently ran away and did not comply with instructions from Ms. Noinongyao or from Plaintiffs. When K.R. was not in earshot, Ms. Noinongyao advised Plaintiffs to simply ignore this behavior.

75. On April 25, 2023, Plaintiffs left the orphanage with K.R. and returned to their hotel in Bangkok with the child. Around this time, Plaintiffs stopped administering medication to K.R. on the real-time advice of their consulting pediatrician.

76. K.R. displayed severe behavior that then worsened and became more dangerous. Specifically, K.R. frequently attempted to run away and harm herself, including by jumping off the eleven-story balcony outside their hotel room, attempting to climb on wall-mounted shelves inside the hotel room, banging her head on wall-mounted mirrors, and inserting her fingers into electrical outlets. Plaintiffs' daughter witnessed K.R.'s balcony incident and had to physically pull K.R. off the railing. In another incident, Plaintiff's daughter tackled K.R. while running through the hallways of the hotel in order to keep her safe as she attempted to flee.

77. K.R.'s behavior also posed a threat to Plaintiffs and their daughter. K.R. was aggressive towards Plaintiffs by pinching, punching, hitting, kicking and destroying surrounding property in the hotel room. K.R. attempted to strangle Plaintiffs, but Plaintiffs' daughter intervened and pulled K.R. away from them.

78. Due to K.R.'s severe, unpredictable behavior, and in the interest of the family's safety, Plaintiffs decided to separate K.R. from their daughter. Except for family meals and overnight sleeping, Mr. Irwin stayed with K.R., while Ms. Colasanti stayed with their daughter.

20

79.     While in Bangkok, K.R. expressed that she missed the other children at Songkhla Orphanage.  Upon K.R.'s request, Plaintiffs communicated with HSF and arranged for K.R. to write a letter to those children.  Plaintiffs informed Holt of this arrangement.

80.     K.R.'s letter contained an apology for hitting other children at the orphanage (*i.e.*, physical abuse).  In response, several children from the orphanage wrote back (including their names and photos) and apologized for physically and verbally abusing K.R.  Accordingly, Plaintiffs contacted Holt to express their concerns.  Plaintiffs were growing increasingly concerned that K.R. required attention, treatment, and care well beyond what they could provide.

81.     On May 3, 2023, the Thailand DCY issued a verification stating that the Child Adoption Board ("CAB") had approved Plaintiffs for a post-placement period.  **Exhibit 8**.  This document permitted Plaintiffs to travel back the United States with K.R. and complete the requisite six-month probationary placement period, under Holt's supervision, prior to finalizing K.R.'s adoption.

82.     Plaintiffs also executed a document with the Thai government on May 3, 2023, entitled "Memorandum of Agreement." **Exhibit 9**.  The Thai Memorandum of Agreement spelled out Plaintiffs' obligations to comply with Thai law leading up to and during the adoption/placement process.  Most importantly, Plaintiffs stated in that document:

> In the event that Holt International Children's Services, Inc. reports against the adoption[,] We hereby agree that we shall discontinue the adoption and allow Holt International Children's Services, Inc. to arrange without delay a temporary care and a new placement of [K.R.] with a view of adoption or to arrange alternative long-term care.

83.     On May 5, 2023, the United States Department of State issued the Hague Custody Certificate granting Plaintiffs "legal custody for the purposes of emigration and adoption." Plaintiffs are each listed as a "Prospective Adoptive Parent."  **Exhibit 10**.  Despite its clear

language, Holt repeatedly represented to Plaintiffs, both verbally and in writing, that this document made Plaintiffs the "legal guardian" of K.R., which was unequivocally false.

84.     On May 8, 2023, while still in Bangkok, Plaintiffs consulted with CHOP International Adoption Health Program Medical Director, Dr. Susan Friedman, MD, their family pediatrician, Dr. Robert Duncheskie, MD, and their family adoption therapist, Dianne Kuchlak, MSS, LCSW, who specializes in attachment therapy and family counseling, regarding how to meet K.R.'s best interests, specifically whether to bring her to the United States for care, or to leave Thailand without her. This was a continuation of the consultations with these professionals that had been began prior to Plaintiffs' trip to Thailand and became more frequent when Plaintiffs began to have concerns about their ability to care for K.R. while still in Thailand.

85.     On May 8, 2023, Plaintiffs also notified Holt via email about K.R.'s escalating behavioral issues and requested a Zoom meeting with Holt's Senior Director of Clinical Services, Celeste Snodgrass. Plaintiffs' follow-up email, in which Plaintiffs reported another outburst from K.R., as well as the outburst's effects on the family, is attached hereto as **Exhibit 11**.

86.     On May 8, 2023, Plaintiffs met with Ms. Snodgrass virtually when she suggested that they speak with other families that had adopted older girls from Songkhla Children's Home who also struggled with behavioral issues. As Plaintiffs later learned, however, Holt and Ms. Snodgrass were careful only to connect Plaintiffs with families that had adopted children with behavioral issues from the Songkhla orphanage but later finalized their adoptions.

87.     But there were other families having gone through Holt's Thailand Special Needs Project that were in crisis, *facing similarly severe and dangerous behavioral and psychological problems* at home in the U.S., and who disrupted and/or did not finalize their adoptions   *Holt*

22

*knew of these families (and their respective crises) but failed to connect Plaintiffs with any of them or even alert Plaintiffs to their existence*.

88.    On May 9, 2023, Ms. Snodgrass responded to Plaintiffs' prior email from May 8, 2023.  Ms. Snodgrass explained that, were Plaintiffs to leave Thailand without K.R., K.R. would return to Songkhla but likely move to another orphanage, one where Plaintiffs later learned abuse was also occurring.

89.    In that same email, Ms. Snodgrass made the following statement, "should you decide you cannot continue, you will still need to legally finalize the adoption to help secure her legal status and afford her access to resources and we will continue to work with you from that point on trying to identify a new adoptive placement."

90.    Plaintiffs later learned, however, that they were *not* required to finalize the adoption and that K.R. already had legal status in the United States as a Legal Permanent Resident (*i.e.*, a Green Card holder).

91.    Furthermore, Plaintiffs have learned from their own experience, as well as the experiences of other families, that *Holt repeatedly pressured and coerced adoptive families into finalizing their adoptions before offering help and resources*.  Indeed, in the statement referenced above, Holt outlined to Plaintiffs its intent to withhold assistance and resources from K.R. if Plaintiffs did not finalize the adoption.

92.    Finally, in contravention of Holt's requirements under contractual, international, federal, and state law, Ms. Snodgrass in an email also stated that, should Plaintiffs disrupt the adoption, they were required to secure legal immigration status for and provide support to K.R. until Holt found an alternative adoptive placement.  **Exhibit 12**.

93.    Prior to May 10, 2023, Plaintiffs did not take K.R. to restaurants because of her unsafe behaviors.  On her last day in Thailand, on May 10, 2023, Plaintiffs attempted to allow K.R. to have a special lunch experience in the hotel restaurant.  HSF staff was also having lunch in another part of the restaurant with other Holt families going through the in-country placement process.

94.    During a major outburst in the restaurant, K.R. hit and kicked others, yelled and ran throughout the hotel, including running toward the sliding doors and the street beyond.  She also threw and destroyed utensils and plates.  Plaintiffs had no choice but to remove K.R. to the hotel room.  HSF social workers followed Plaintiffs and K.R. to the hotel room, where they physically restrained her for nearly 30 minutes to prevent further harm to herself or others.

95.    Holt social workers then suggested that they could take K.R. to the HSF office for K.R. to reside for a few weeks while Plaintiffs could relocate to another hotel.  During the conversation, they told Plaintiffs that K.R. would return to Songkhla Orphanage if Plaintiffs returned to the United States without her.  They also stated that Plaintiffs were K.R.'s "last hope."

96.    Plaintiffs considered Holt's suggestion but were unable to follow it due to the large financial burden that would be thrust upon Plaintiffs—changing their flights alone would have cost them approximately $24,000.  Thus, they decided to return home with K.R. and pursue treatment in the United States after further consultation with physicians in the United States and in a good-hearted effort to give K.R. an opportunity for a more stable future.

97.    On May 10, 2023, before boarding the first of three flights in their return to the United States, Plaintiffs sedated K.R. with Benadryl to prevent harm to themselves, other passengers, and herself.  Plaintiffs also sedated K.R. for their second and third flights.

24

98.    On May 11, 2023, Plaintiffs and K.R. landed in the United States and, on May 11, 2023, K.R.'s U.S. Permanent Resident VISA (Green) Card was issued.

**F.    The Post-Placement Experience**

**i.    Plaintiffs Return to The U.S. and K.R. Is Hospitalized (Holt Does Nothing)**

99.    Plaintiffs and their daughter arrived home in the U.S. with K.R. on May 12, 2023. K.R.'s violence, aggression, and dangerous behaviors both towards herself and Plaintiffs' family continued to escalate to a significantly greater degree and frequency than her behavior with Plaintiffs in Thailand.

100.    By May 14, 2023, Plaintiffs had no choice but to transport K.R. to CHOP for emergency hospitalization, where she remained until May 25, 2023.

101.    Plaintiffs communicated these developments to Holt on a nearly daily basis. Given Plaintiffs' knowledge of K.R.'s abuse in Thailand, and her escalating, dangerous, disruptive, violent, and significantly aberrational behavior, Plaintiffs began asking Holt about alternative placement options for the child in the U.S. Holt initiated internal discussions concerning the potential repatriation of K.R. to Thailand around this same time.

102.    K.R.'s behaviors worsened even further while at CHOP and required the assignment of a full-time psychiatric technician. CHOP physicians also placed K.R. on new psychiatric medications, but K.R.'s behaviors only continued to escalate.

103.    To make matters worse, CHOP physicians also diagnosed K.R. with latent tuberculosis ("TB"). Because of K.R.'s TB diagnosis, the child could not be discharged into a short-term psychiatric facility and could only be discharged home with Plaintiffs.

104.    CHOP psychiatric staff advised Plaintiffs that K.R.'s repatriation to Thailand would be in the child's best interests.

105. CHOP discharged K.R., and Plaintiffs returned home with the child, who was still in the midst of a recently emerged psychiatric crisis. CHOP staff advised Plaintiffs that, if K.R.'s situation continued to escalate, Plaintiffs should contact a local crisis unit, re-present to a local emergency room, or call 911.

106. Unbeknownst to Plaintiffs—because they had no opportunity to plan for such a crisis—there was no available local crisis unit/center in Plaintiffs' area, Plaintiffs' local emergency room did not have a psychiatrist on staff, and the only psychiatric hospital in Plaintiffs' area had shut down. This left calling 911 or simply cycling from one medical discharge to another as the only ways in which Plaintiffs could address K.R.'s extreme psychiatric needs.

### ii. Plaintiffs Endure a Month at Home with K.R. (Holt Does Nothing)

107. Upon CHOP's discharge of K.R., the child resided in Plaintiffs' home from May 25, 2023, to June 23, 2023.

108. On May 25, 2023, Plaintiffs again informed Holt via e-mail of K.R.'s circumstances. **Exhibit 13**. In concluding that e-mail, Plaintiffs wrote: "[W]e are requesting some clarity, in writing, on what the alternative placement options could be for [K.R.], if she cannot remain with our family. We would like specific options, along with timelines and logistics."

109. Each day K.R. was in their home, Plaintiffs and their daughter endured K.R.'s numerous and more frequent behavioral and psychiatric outbursts of increasing intensity. These episodes, much of which included behavior that K.R. had not previously demonstrated to Plaintiffs, included, among other things:

> a. Sexual behaviors directed towards Ms. Colasanti;
>
> b. Hitting, kicking, and biting;
>
> c. Throwing furniture;

     d.      Seeking weapons;

     e.      Urinating inside the home;

     f.      Verbal aggression;

     g.      Acts of aggression towards Plaintiffs' pet;

     h.      Attacking Plaintiffs while they slept;

     i.      Feigning affection in order to get close enough to Ms. Colasanti to attempt to strangle her;

     j.      Attempting to push Mr. Irwin down a flight of stairs;

     k.      Multiple attempts at self-harm;

     l.      Attempting to climb over a second-story banister;

     m.      Attempting to kick through doors;

     n.      Running out into the street; and

     o.      Escaping from Plaintiffs' home.

110. Maintaining safety in the home became a full-time operation for Plaintiffs and their daughter. Plaintiffs were required to add double locks to all interior doors and triple locks to all exterior doors of their home. Redundant locks were also added to all windows. Plaintiffs utilized therapeutic "basket holds" multiple times each day to keep K.R. from injuring herself or others.

111. Another family (that found itself in a similar situation because of Holt and had been placed with a child from the same orphanage) advised Plaintiffs to install security cameras throughout the home and to conduct routine perimeter safety sweeps. Other families described needing to have safe rooms, removing all sharp objects from the home, and reinforcing doors with wooden planking to prevent forced entry.

112.    During this time, and because of the disruption K.R.'s presence in the home caused, Mr. Irwin had no choice but to take short-term leave from his employment, and Plaintiffs' daughter had to be granted an exemption by her high school due to her inability to complete courses necessary to graduate.

113.    Plaintiffs informed Holt of each of these troubling developments, which Plaintiffs did not anticipate and which Plaintiffs could not have predicted.

114.    Plaintiffs also engaged the CHOP International Adoption Health Program, which outlined a list of ten diagnoses from which K.R. was/is suffering and recommended a medically supervised group home environment for the child in a letter written directly to Holt.

115.    In response to such letter, Holt did nothing.  ***Indeed, at no time did Holt visit or evaluate K.R., notwithstanding the fact that Holt's Pennsylvania office is located within 20 miles of CHOP: a drive of less than one hour***.  Moreover, at no time did Holt investigate any medically supervised group home placement for K.R., despite CHOP's urgent recommendation, of which Holt was aware.

116.    Holt's first post-placement visit to Plaintiffs' home was scheduled for June 23, 2023.  During that visit, a Holt social worker, Ms. Sama Alghali, observed K.R.'s extreme behaviors but chose to take no photos or videos documenting the episode.  Instead, the Holt social worker advised Plaintiffs that they should call 9-1-1 and have K.R. transported to Pottstown Hospital.  Plaintiffs followed this advice.

### iii.    K.R. is Hospitalized a Second Time (Holt Does Little to Nothing)

117.    Upon arrival at Pottstown Hospital, Holt's social worker advised Plaintiffs to refuse K.R.'s discharge.  When Plaintiffs did so, however, hospital staff contacted the Pennsylvania Department of Human Services "ChildLine" to report Plaintiffs for parental abandonment.

28

118.    Seeking to protect K.R., Plaintiffs contacted CHOP to inquire about possible alternatives.  Along with Ms. Alghali, Plaintiffs elected to withdraw K.R. from Pottstown Hospital and transport the child to CHOP.

119.    K.R. was then hospitalized for a second time (on June 23, 2023) at CHOP in a secured psychiatric unit called the Medical Behavioral Unit ("MBU").

120.    On June 28, 2023, Plaintiffs sent Holt a letter stating:

> As previously discussed, our family intends to disrupt the adoption of [K.R.] from Thailand.  In this process, we also intend to cooperate with the involved parties, including the team of professionals at the Children's Hospital of Philadelphia, who are currently managing her treatment here in the United States.  We have done, and will continue to do, all that we can to help [K.R.] gain positive momentum for a change in the trajectory of her life.  **Exhibit 14**.

121.    On July 6, 2023, Holt provided Plaintiffs with a draft "Disruption Services Agreement."  **Exhibit 15**.  *Holt (specifically, Holt employee Ms. Lisa Vertulfo), however, contemporaneously instructed Plaintiffs not to sign the Disruption Services Agreement.*

122.    Moreover, the Disruption Services Agreement provided to Plaintiffs by Holt would have required Plaintiffs to "pay all costs of temporary foster care" for K.R. and *included no placement plan whatsoever for the child*.

123.    Due to Holt's inaction (and apparent indifference), Plaintiffs had no choice but to engage multiple attorneys at significant expense in order to persuade Holt to take action.

124.    On July 13, 2023, Plaintiffs wrote a letter to the Thai Red Cross Society Children's Village requesting that it admit K.R. into its children's home if repatriation were to occur.  **Exhibit 16**.  This letter was sent to Holt with a request that Holt forward the letter to the Thai Red Cross Society Children's Village.  Holt, however, refused to forward the letter.

125.    Plaintiffs also wrote similar letters directed to both the U.S. Department of State and Thailand DCY on July 13, 2023, requesting that K.R. be repatriated to Thailand, as Holt had determined at that time that repatriation was in K.R.'s best interests.  **Exhibit 17**. These letters were also sent to Holt with a request that Holt forward them accordingly.  Holt, however, also refused to forward those letters.

126.    Also on July 13, 2023, Plaintiffs directed their second letter to Holt expressing their intention to disrupt K.R.'s placement/adoption.  There, Plaintiffs wrote: "We write with heavy hearts, after needing to make one of the most difficult decisions of our lives -- to disrupt [K.R.'s] adoption."  **Exhibit 18**.

127.    On July 25, 2023, Plaintiffs wrote a third disruption letter to Holt expressing unequivocally, once and for all, that they were disrupting K.R.'s placement/adoption.  **Exhibit 19**. Holt demanded Plaintiffs write this letter because their previous letters purportedly did not use the specific language of "intent to disrupt," despite each foregoing letter clearly expressing such intent and despite the agony Plaintiffs endured in having to repeatedly express it.  *See* ¶¶ 120, 121, 126 *supra*.

128.    On August 11, 2023, CHOP forcibly discharged K.R., despite the documented increase in the child's behavioral severity and danger to both herself and others.  Attorneys representing CHOP threatened Plaintiffs with criminal charges should they refuse to accept the discharge of K.R.  This led to Plaintiffs' continued accruement of legal costs and exacerbated their severe and extreme emotional distress.  ***The Chester County Office of Children, Youth and Families also refused to intervene, stating directly to Holt that, if further support were necessary, it was Holt's responsibility to provide it.***

129.    In light of K.R.'s extreme and dangerous behavior, K.R. could not safely return with Plaintiffs to their home.  Thus, as CHOP's forced discharge of K.R. was approaching, Plaintiffs began communicating with several acute in-patient providers across Pennsylvania, with none accepting K.R. for admission.

130.    Notwithstanding these concerns, CHOP ultimately sedated and discharged K.R. on August 11, 2023, leaving Plaintiffs no choice but to transport the child nearly two hours away to the Lehigh Valley Health Network's ("LVHN") Emergency Psychiatric Department.

### iv.    K.R. is Hospitalized a Third Time (Holt Does Nothing)

131.    Upon arrival at LVHN on August 11, 2023, K.R. attacked hospital staff and other patients and eventually had to be restrained with straps and sedated fully to rest.  K.R. was ultimately placed in a locked emergency unit.

132.    Over the next three days, LVHN physicians told Plaintiffs that K.R.'s behaviors and needs were beyond their hospital's capabilities.  Instead, those physicians recommended that Plaintiffs transport K.R. to Western Psychiatric Hospital ("WPH") in Pittsburgh, Pennsylvania, which was the only Pennsylvania psychiatric hospital from which K.R. could not be unsafely discharged.

133.    LVHN sedated K.R. and discharged her to Plaintiffs.

### v.    K.R. Is Hospitalized a Fourth Time (Holt Does Nothing)

134.    During the late-night hours of August 14, 2023, Mr. Irwin, another family member, and Plaintiffs' daughter drove roughly five hours across Pennsylvania with K.R. and arrived at WPH.  Again, K.R. was placed in a locked emergency unit.

135.    The following morning, K.R. was admitted to WPH's Children's Acute In-Patient Unit.  K.R.'s behaviors continued to escalate, requiring frequent restraint, seclusion, and rescue

medications. K.R. continued to attack doctors, nurses, security guards, and other WPH patients, leading to nearly daily calls from WPH staff to Plaintiffs documenting and reporting these behaviors.

136. Crucially, it was around this time that Plaintiffs were informed by a WPH psychiatrist that this level of behavior and dysregulation was *K.R.'s baseline condition*.

137. Within an incredibly restrictive environment, K.R.'s behaviors could be controlled, but only when K.R. was not in the presence of Plaintiffs. At this time, *having been all but abandoned by Holt* and realizing the gravity of K.R.'s acute needs, Plaintiffs engaged representatives from the Chester County Mental Health/Intellectual & Developmental Disabilities department, Community Care Behavioral Health, Chester County DHS, and their private insurance.

138. K.R.'s behavior became so aggressive and severe when in the presence of Plaintiffs that WPH staff eventually recommended that Plaintiffs stop visiting K.R. for several months.

139. Holt was participating in bi-weekly meetings with WPH staff during this time, indicating that the only possible alternative for K.R. was her repatriation to Thailand and stating that Holt was awaiting a response from the Thai government concerning the timing of repatriation, which was reportedly only weeks away.

140. While still at WPH, K.R. was diagnosed with Turner Syndrome on November 26, 2023. Turner Syndrome is a rare genetic condition in which a female does not have the usual pair of X chromosomes. Treatments for Turner Syndrome can result in expenses in excess of $50,000 per year.[9] Plaintiffs informed Holt of this diagnosis.

---

[9] *See* Turnersyndromefoundation.Org, *Growth Treatment*
https://turnersyndromefoundation.org/what_is_turner_syndrome/growth/growth-

32

141.    During her roughly four-month stay at WPH, K.R. was referred to additional healthcare providers and residential treatment facilities across Pennsylvania, including as a respite placement until such time as repatriation could be executed by Holt.  These additional healthcare providers and residential treatment facilities refused to accept K.R.  Eventually, on December 5, 2023, K.R. was transported by ambulance from WPH to Woods Services ("Woods"), a residential treatment facility in Langhorne, Pennsylvania—the only facility identified that would accept her (*and only in a temporary respite capacity until repatriation occurred which, according to Holt, was still only weeks away*).

142.    At Woods, K.R. was placed in a group home setting with non-verbal, largely autistic peers and with no discharge goals able to be established for her.  This placement does not meet K.R.'s actual, known needs.  K.R. remains at Woods as of the filing of this Complaint.

### vi.        Plaintiffs' and K.R.'s Current Circumstances

143.    Shortly after K.R. was admitted to Woods, the Thai government informed Holt that the only possible repatriation plan available to K.R. was her return to Songkhla Orphanage—a place at which both Plaintiffs and Holt knew that K.R. had been subjected to abuse.

144.    Still, Holt continued to maintain that it would be in K.R.'s best interests for her to return to Songkhla Orphanage, despite Holt's knowledge of abuse there.  Dr. Friedman of CHOP's International Adoption Health Program issued a letter to Holt advising that repatriation was not in K.R.'s best interests.  Holt disregarded this advocacy and continued to pursue repatriation.

145.    Around this time, Plaintiffs began to discuss K.R.'s Turner Syndrome diagnosis with endocrinologists at CHOP's Turner Syndrome Clinic.  One such physician informed Plaintiffs

---

treatment/#:~:text=Growth%20treatment%20is%20expensive%2C%20costing,support%20to%20those%20in%20need. (last visited Sept. 5, 2025).

that she could not ethically recommend K.R.'s repatriation because of the child's acute and highly specialized medical needs, including, but not limited to, hormone therapy, growth hormone, and specialized lifetime medical management care. CHOP physicians also informed Plaintiffs that K.R. is at risk of a potentially fatal cardiac event due to her Turner Syndrome diagnosis, which will require life-long medical monitoring.

146. During conversations between the U.S. Department of State and Holt, the Department of State indicated that it would not approve any repatriation plan that would result in K.R.'s being returned to Songkhla Orphanage.

147. On February 21, 2024, Holt officially withdrew its request that K.R. be repatriated. The U.S. Department of State acknowledged that withdrawal on February 24, 2024.

148. On November 11, 2024, Thailand DCY (the Thai "Central Authority") wrote to Holt via e-mail stating that "[Holt must] provide support and long-term plan for [K.R.], funding care and treatment, [and Holt shall be K.R.'s] legal guardian and caretaker." [sic throughout]. **Exhibit 20**.

149. Additionally, Thailand DCY's letter of November 11, 2024, directed Holt to attempt to "find a suitable adoptive family for the [K.R.]." *Id.* The letter also indicated that its demands and recommendations were made pursuant to Article 21 (1)(a), (b) of the Hague Convention on the Protection of Children and Co-operation in Respect of Intercountry Adoption. *Id.*

150. K.R.'s placement at Woods is expressly temporary and is not aligned with K.R.'s short- or long-term needs. K.R.'s placement at Woods is fully funded by Community Care Behavioral Health ("CCBH"), a Medicaid management agency (amounting to at least $30,000 per month, exclusive of outside medical and dental provider costs).

34

151.    K.R.'s funding through CCBH/Medicaid is due to expire on or around November 23, 2025, at which point, on information and belief, Woods may discharge K.R. if her CCBH/Medicaid funding is not approved for renewal.  There remains no plan for K.R.'s long-term care, more than two years after Plaintiffs expressed their intent to disrupt.  At the time of this Complaint, Holt still has not performed any direct assessment of K.R., nor has it determined her available placement options or evaluated her best interest in any way or at any time.

152.    Additionally, various local and commonwealth entities (school districts, offices of Children, Youth and Families, Woods staff, etc.) continue to direct inquiries to Plaintiffs concerning K.R.'s future.  Holt, on the other hand, does nothing more than virtually attend various meetings with Plaintiffs, while offering no updates or substantive information about K.R.'s long-term placement goals.

153.    On information and belief, ***all Holt employees that were initially directly involved in placing K.R. with Plaintiffs have either been terminated by Holt or have resigned***.

154.    CHOP physicians recently alerted Plaintiffs that K.R. must begin intensive hormone therapy to treat her Turner Syndrome, as outlined in a letter from CHOP physicians on March 25, 2025.  **Exhibit 21**.  Such treatment is likely to cost thousands of dollars per month, billed directly to Plaintiffs' primary and secondary health insurance.

155.    At the time of this Complaint, K.R.'s current medical and psychiatric diagnoses include:

- Turner Syndrome
- Medically Complex Patient (Hashimoto's Thyroiditis, Failure to Thrive, Head-Sparing Small for Gestational Age, Poor Dentition, Ovarian Failure)
- Hyperlipidemia
- Intellectual and Developmental Disability
- ADHD
- Generalized Anxiety Disorder
- Reactive Attachment Disorder

- Adjustment Disorder with mixed disturbance of emotions and conduct
- Conduct Disorder
- Early Childhood Trauma and Speech and Language Delay
- Resolved latent TB infection & H Pylori infection
- Primary language disruption

156.    On August 1, 2025—and only after being faced with Plaintiffs' threat of litigation—Holt filed an Application to File Private Dependency Petition with respect to K.R. under Pennsylvania Rule of Juvenile Court Procedure 1320 in the Court of Common Pleas, Chester County.  Such dependency proceedings are ongoing at the time of the filing of this Complaint.

157.    In the void of Holt's failing to fulfill its duties, Plaintiffs have felt a moral, personal, and ethical responsibility not to abandon K.R., as others have throughout her childhood.  To this day, Plaintiffs continue to act in K.R.'s best interest, driven by hope that through proper interventions, treatment and placement, K.R. can live a safe and peaceful life to the extent she is able.  Tragically, Holt has failed Plaintiffs (and K.R.), devastating their emotional and financial wellbeing in the process.

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT

158.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 157 as though fully set forth herein.

159.    On or about June 24, 2021, Plaintiffs entered into a certain written contract with Defendant Holt (hereinafter, the "Placement Agreement").

160.    The Placement Agreement, according to its terms, supersedes and incorporates an earlier agreement between the Parties (hereinafter the, "International Adoption Services Agreement"), entered into on or about February 23, 2021.

36

161.    True and correct copies of the Placement Agreement and the International Adoption Services Agreement are attached hereto as **Exhibits 5** and **1**, respectively, and incorporated herein by this reference.

162.    Pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, Plaintiffs are entitled to a judicial determination concerning the Parties' rights and obligations, if any, under the International Adoption Services Agreement and the Placement Agreement.

163.    Pursuant to the Placement Agreement:

"Disruption of the placement initiated by either party does not extinguish or affect [Plaintiffs'] financial obligations under the section of this agreement entitled 'Care of the Child.' However, Holt may, in its sole discretion, offer to assume some or all of [Plaintiffs'] post-disruption financial obligations regarding the child in exchange for payment by [Plaintiffs] of a 'disruption fee' or 'termination fee,' in an amount to be determined by Holt based on Holt's reasonable beliefs regarding the costs to Holt of caring for, transporting, and re-placing the child. Such a termination fee is intended as an enforceable modification of this agreement and not as either a penalty or liquidated damages. [Plaintiffs'] financial obligations under this agreement will continue until such time as [Plaintiffs have] paid such termination fee and fully cooperated with Holt to achieve a satisfactory new placement for the child." *See* **Ex. 5** at ¶ 10.7.

164.    A controversy exists between the Parties concerning the validity and enforceability of the Placement Agreement as follows:

a.    Plaintiffs contend that their financial obligations under the Placement Agreement with respect to K.R., if any, have concluded as of the date they "disrupted" their prospective adoption of K.R.

b.    Defendant Holt contends that Plaintiffs remain financially responsible for K.R.

165. By reason of the foregoing, a declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities that exist among the parties to the Placement Agreement.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order:

a. Declaring that, under the Placement Agreement, Plaintiffs' financial obligations, if any, for and concerning K.R. have concluded as of the date Plaintiffs "disrupted" the prospective adoption of K.R. or a date to be determined by the Court.

b. Declaring the rights, obligations, and other legal relations of Plaintiffs and Defendant arising out of the Placement Agreement, if any.

c. Declaring and granting such other and further relief as may be necessary and appropriate under the circumstances, including all other relief available at law or in equity to which Plaintiffs may be entitled and which this Court deems just and proper.

<u>**SECOND CAUSE OF ACTION**</u>

**INTENTIONAL OR FRAUDULENT MISREPRESENTATION**

166. Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 165 as though fully set forth herein.

167. Defendant Holt made representations to Plaintiffs both orally and in writing concerning the existence and extent of K.R.'s medical, behavioral, and psychological complications.

168. Specifically, Defendant Holt represented, among other things, that K.R. had no history of severe or extreme behavioral disorders or severe or extreme psychological complications or disorders.

169. Defendant Holt's representations concerning K.R. were material to the placement and/or adoption transaction or process concerning K.R.

170. Upon information and belief, Defendant Holt's representations concerning K.R. were made falsely and recklessly, with knowledge of that falsity or recklessness as to whether such representations were true or false.

171. Upon information and belief, Defendant Holt made such representations with the intent of misleading Plaintiffs into relying upon such representations.

172. Plaintiffs did rely upon such representations, and Plaintiffs' reliance was justifiable under the circumstances.

173. Plaintiffs have suffered harm as a direct and proximate result of Defendant Holt's misrepresentations (upon which Plaintiffs justifiably relied), including, but not limited to, severe and ongoing emotional distress, financial losses and liabilities related to K.R.'s necessary medical and psychological treatment, and other compensable injuries, harm, or damages.

174. Defendant Holt's misrepresentations of material fact amounted to conduct that was extreme, outrageous, intentional, and/or wanton, and such misrepresentations were made in conscious disregard of Plaintiffs' rights and wellbeing.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

i. Compensatory damages in excess of $75,000 exclusive of interest and costs, in an amount to be determined at trial;

ii. Punitive damages;

iii. Interest and costs, including attorneys' fees; and

iv. Such other and further relief as the Court may deem just and proper.

## THIRD CAUSE OF ACTION

## INTENTIONAL OR FRAUDULENT NON-DISCLOSURE/CONCEALMENT

175.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 174 as though fully set forth herein.

176.    Defendant Holt concealed from and/or failed to disclose information to Plaintiffs, at multiple points in time, concerning the existence and extent of K.R.'s medical, behavioral, and psychological conditions and complications, as well as abuse occurring within multiple orphanages serviced by Holt's Thailand Special Needs Project.

177.    Defendant Holt's concealments and non-disclosures concerning K.R. were material to the placement/adoption transaction.

178.    Upon information and belief, Defendant Holt's concealments and non-disclosures of material fact were carried out intentionally or recklessly.

179.    Upon information and belief, Defendant Holt concealed or failed to disclose material information concerning K.R. with the intent of misleading Plaintiffs into relying upon incomplete information.

180.    Plaintiffs relied upon such incomplete information, and Plaintiffs' reliance was justifiable under the circumstances.

181.    Plaintiffs have suffered harm as a direct and proximate result of Defendant Holt's misrepresentations, failures to disclose, and concealments.

182.    Defendant Holt's intentional or fraudulent non-disclosures and/or concealment of materials facts and information amounted to conduct that was extreme, outrageous, intentional, and/or wanton, and such conduct was carried out in conscious disregard of Plaintiffs' rights and wellbeing.

40

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

      i.      Compensatory damages in excess of $75,000 exclusive of interest and costs, in an amount to be determined at trial;

      ii.      Punitive damages,

      iii.      Interest and costs, including attorneys' fees; and

      iv.      Such other and further relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

183. Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 182 as though fully set forth herein.

184. As alleged herein, Defendant Holt's conduct has been extreme, outrageous, totally outside the bounds of decency and utterly intolerable in a civilized society.

185. The knowing or reckless provision of false information by adoption agencies or intermediaries, like Defendant Holt, to prospective adoptive parents, like Plaintiffs, so as to induce them to accept a particular child is reprehensible. Additionally, false or misleading information about the medical or psychological conditions or prior physical abuse of children placed for adoption is likely to have devastating results and is substantially certain to result in emotional harm to prospective adoptive parents, like Plaintiffs.

186. As a result of Defendant Holt's actions, inactions, and/or omissions, including but not limited to the acts, inactions, or omissions set forth above, Plaintiffs have suffered and continue to suffer severe emotional distress and associated physical manifestations, including, but not

41

limited to, depression, sleeplessness, and panic attacks. Plaintiffs have also suffered loss of earnings due to Defendant Holt's actions and inactions.

187. As a result of Defendant Holt's extreme and outrageous conduct, Plaintiffs have been forced to consult with and be treated by several physicians and mental health care providers, thereby incurring expenses in excess of $25,000. Plaintiffs also experienced a loss of income of approximately $150,000.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

     a.     Compensatory damages in an amount in excess of $75,000 exclusive of interest and costs;

     b.     Punitive damages; and

     c.     Attorneys' fees and such other relief as the court finds just and proper.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

188. Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 187 as though fully set forth herein.

189. On or about February 23, 2021, Plaintiffs entered into a contract with Defendant Holt for the ultimate purpose of adopting a child who did not have severe or extreme behavioral or psychological or medical complications or disorders. As part of that contract, Defendant agreed, among other things, to make reasonable efforts to provide Plaintiffs with all available medical, psychological, historical, and other records and information concerning the child to be adopted, and to provide accurate, complete, and truthful information regarding the background, medical history, and behavioral history of the child to be adopted.

42

190.    A unique and special relationship exists between an adoption agency, such as Defendant Holt, and prospective adoptive parents, such as Plaintiffs, that gives rise to the adoption agency's duty to act with reasonable care in disclosing information material to the placement and/or adoption decision and a duty to fully disclose material information concerning the adoption and/or placement decision.

191.    Defendant Holt knew or should have known that Plaintiffs were relying on the adoption agency's purported expertise and its representations in Plaintiffs' making the profound and life-altering decision to adopt a child, and that any failure to exercise due care in that process could foreseeably result in Plaintiffs' severe emotional distress.

192.    For reasons including Defendant Holt's special relationship with Plaintiffs, Defendant Holt knew of Plaintiffs' particular susceptibility to emotional distress.

193.    Defendant Holt breached its duty of care owed to Plaintiffs by misrepresenting, concealing, failing to reasonably investigate, and/or failing to disclose critical and material information regarding K.R.'s prior history, including, but not limited to, K.R.'s severe psychological trauma, K.R.'s history of violent and destructive behavior, K.R.'s history of trauma, and K.R.'s diagnosed or otherwise readily apparent behavioral and/or psychological disorders, despite Holt's being in possession of, or having access to, such information.

194.    As a direct and proximate result of Defendant Holt's negligence, Plaintiffs were subjected to unforeseen, extreme, and ongoing emotional distress, stemming from, among other things, both the inability to prepare for or respond to the child's significant, undisclosed issues, as well as the loss of the opportunity or ability to finalize the adoption of the child, and the new need to address re-traumatization of the family's twenty-one-year-old daughter.

195. Plaintiffs have suffered severe emotional distress, including, but not limited to, anxiety, depression, loss of sleep, devastating grief and loss, persistent sadness, emotional trauma, and mental anguish as a direct and foreseeable result of Defendant Holt's breaches of duty.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a. Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b. Punitive damages; and

c. Attorneys' fees and such other relief as the court finds just and proper.

## SIXTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

196. Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 195 as though fully set forth herein.

197. As part of its obligations and duties under law, including statutory, contractual, and/or common law, Defendant Holt owed to Plaintiffs a duty and obligation to make a reasonable investigation and to exercise reasonable care in investigating and disclosing material facts concerning the background of the child to be adopted (*i.e.*, K.R.), including but not limited to the child's medical history, psychological profile, behavioral history, and history of abuse. Defendant Holt also had a common law duty to make a reasonable investigation of the truth and accuracy of its representations concerning the background of the child to be adopted, including but not limited to the child's medical history, psychological profile, behavioral history, and history of abuse.

198. Prior to and/or during the placement and/or adoption process, Plaintiffs requested and relied on disclosures from Defendant Holt concerning K.R.'s background, including, but not

44

limited to, any history of psychological and other trauma, behavioral issues, and diagnoses of mental or developmental disorders.

199.    Despite its duty to do so, Defendant Holt negligently misrepresented and/or omitted material facts and information about K.R. which were known to it, or which it should have discovered through the exercise of reasonable care and investigation.  These misrepresented and/or omitted facts and information include, but are not limited to, K.R.'s:

a.    History of severe, aggressive, and destructive behaviors;

b.    Severe psychological/psychiatric disorders; and

c.    Experience with psychological, physical, and/or sexual abuse or trauma.

200.    Defendant Holt knew, had access to, or in the exercise of ordinary care should have obtained and/or been aware of such facts and information prior to Defendant Holt's requesting that Plaintiffs sign the Placement Agreement but failed to obtain such facts and information or otherwise failed to communicate such facts or information to Plaintiffs.

201.    Defendant Holt's misrepresentation of this material information constituted a breach of its obligations and duties of care to Plaintiffs under law, including statutory, contractual, and common law.

202.    Plaintiffs justifiably relied on Holt's misrepresentations and the absence of the above-referenced facts and information (e.g., the absence of severe, aggressive, and destructive behaviors, the absence of psychological disorders, and the absence of certain types of trauma) in making the decision to proceed with the placement and/or adoption of K.R. (which was ultimately disrupted) and were reasonably unaware of the withheld information and further continued to rely on Holt's misrepresentations.

203.    As a direct and proximate result of Defendant Holt's negligence, Plaintiffs have suffered severe emotional distress and mental anguish, financial losses related to K.R.'s unanticipated care, therapy, and treatment, and other compensable injuries.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a.    Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b.    Punitive damages; and

c.    Attorneys' fees and such other relief as the court finds just and proper.

## SEVENTH CAUSE OF ACTION

### NEGLIGENT NON-DISCLOSURE/CONCEALMENT

204.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 203 as though fully set forth herein.

205.    As part of its obligations and duties under law, including statutory, contractual, and common law, Defendant Holt owed to Plaintiffs a duty and obligation to disclose material facts concerning the background of the child to be adopted, including but not limited to the child's medical history, psychological profile, behavioral history, and history of abuse.

206.    Prior to and during the placement and/or adoption process, Plaintiffs requested and relied on disclosures from Defendant Holt concerning K.R.'s background, including, but not limited to, any history of psychological and other trauma, behavioral issues, and diagnoses of mental or developmental disorders.

207.    Despite its duty to do so, Defendant Holt negligently concealed from or failed to disclose to Plaintiffs material facts and information about K.R. which were known to it, or which

46

it should have discovered through the exercise of reasonable care and investigation. These concealed and/or undisclosed facts and information include, but are not limited to, K.R.'s:

a.    History of severe, aggressive, and destructive behaviors;

b.    Severe psychological/psychiatric disorders; and

c.    Experience with psychological, physical, and/or sexual abuse or trauma.

208.    Additionally, on information and belief, Defendant Holt knew or had reason to know of other families in the United States having been paired by Holt with children from Thailand and/or K.R.'s orphanage that had dealt or were dealing with extreme and dangerous behaviors from their respective adoptive children. Defendant Holt negligently concealed and/or failed to disclose such information to Plaintiffs, demonstrating a pattern of behavior consistent with the experiences of other families of which Plaintiffs have since become aware.

209.    Defendant Holt's concealment of and/or failure to disclose this material information to Plaintiffs constituted a breach of its obligations and duties of care to Plaintiffs under law, including statutory, contractual, and common law.

210.    As a direct and proximate result of Defendant Holt's negligence, including Holt's negligent non-disclosure and concealment, Plaintiffs have suffered severe emotional distress and mental anguish, financial losses related to K.R.'s care, therapy, and treatment (unanticipated by Plaintiffs), and other compensable injuries.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a.    Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b.    Punitive damages; and

47

c.      Attorneys' fees and such other relief as the court finds just and proper.

## EIGHTH CAUSE OF ACTION

## BREACH OF CONTRACT

211.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

212.    On or about February 23, 2021, Plaintiffs entered into a written International Adoption Services Agreement (the "IASA") with Defendant Holt, a true and correct copy of which is attached hereto as **Exhibit 1**.

213.    On or about June 24, 2021, Plaintiffs entered into a written Placement Agreement (the "Placement Agreement") with Defendant Holt, a true and correct copy of which is attached hereto as **Exhibit 5**.  The Placement Agreement purports to supersede the IASA but also incorporates IASA by reference.  *Id.* at ¶ 2.

214.    In full consideration of services to be performed under the IASA and Placement Agreement, Plaintiffs paid to Defendant Holt $24,910.

215.    Plaintiffs performed each and every obligation required of them under both the IASA and the Placement Agreement.

216.    The IASA imposed upon Holt the obligation to obtain and supply to Plaintiffs "available information" about K.R.  **Ex. 1** at ¶ 2.1.

217.    The IASA stated that "[a]ll information obtained by Holt regarding [K.R.] . . . will be provided to" Plaintiffs.  *Id.* at ¶ 7.2.

218.    The IASA stated that "Holt will make reasonable efforts to provide [Plaintiffs] with all available medical, psychological, historical, and other records and information concerning" K.R. *Id.* at ¶ 20.6.

48

219.    Defendant Holt materially and substantially breached the IASA, as incorporated by the Placement Agreement, when it misrepresented, concealed, and/or failed to disclose material information to Plaintiffs concerning K.R.'s background, medical history, psychological profile, behavioral history, and history of abuse.   Defendant Holt further breached the IASA, as incorporated by the Placement Agreement, when it failed to undertake a reasonable investigation of the truth or accuracy of its representations to Plaintiffs concerning K.R.'s background, medical history, psychological profile, behavioral history, and history of abuse.

220.    Additionally, the Placement Agreement provided that in the event of disruption to K.R.'s placement/adoption, "Holt will make reasonable efforts to find another adoptive placement for the child that is appropriate given the child's age, needs, and expressed wishes if any.  If no adoptive placement seems likely or possible, Holt will explore other types of placements and resources for the child, including foster care and institutional care." **Ex. 5** at ¶ 10.5.

221.    By letter to Defendant Holt on July 25, 2023 (and pursuant to paragraph 9.1.2 of the Placement Agreement which allowed Plaintiffs to terminate the agreement at any time prior to finalized adoption), Plaintiffs did disrupt the placement/adoption of K.R.  Since then, however, Defendant Holt has materially and substantially breached the Placement Agreement as it has failed to make reasonable efforts to achieve K.R.'s alternative placement as required under paragraph 10.5 of the Placement Agreement.

222.    As described more fully in the preceding paragraphs of this Complaint, Defendant Holt's breaches of the IASA and Placement Agreement have caused Plaintiffs to suffer damages which have accrued and are continuing to accrue, including, but not limited to, medical expenses for themselves and K.R., severe emotional distress, lost wages, and other compensable damages.

Defendant Holt's contractual breaches are of such a type that emotional distress is a particularly likely and foreseeable result.

223.    Plaintiffs' damages as herein alleged flow directly from and are the natural and ordinary result of Defendant Holt's breaches, including but not limited to the breaches set forth above.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a.    Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b.    An order of specific performance, directing that Defendant Holt take the following actions to fulfill Defendant Holt's performance obligations as required by the Placement Agreement:

i.    That Defendant Holt must make reasonable efforts to find another adoptive placement for K.R. that is appropriate given the child's age, needs, and expressed wishes if any.  If no adoptive placement seems likely or possible, Defendant Holt must explore other types of placements and resources for K.R., including foster care and institutional care; and

c.    Attorneys' fees and such other relief as the Court finds just and proper.

### NINTH CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

224.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 223 as though fully set forth herein.

50

225. Defendant Holt's acts, hereinabove pleaded, are in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1, et seq.

226. The UTPCPL prohibits "any person" from employing "unfair or deceptive acts or practices," which are defined to include, among other things, engaging in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding.  73 P.S. § 201-2(4)(xxi).

227. Defendant Holt, as herein alleged, engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding on part of Plaintiffs.

228. Defendant Holt is a "person" within the meaning of the UTPCPL, 73 P.S. § 201-2(11).

229. Defendant Holt knowingly represented to Plaintiffs, as K.R.'s prospective adoptive parents, the nature of K.R.'s medical history, psychological profile, behavioral history, and history of abuse, including representing that K.R. did not exhibit extreme or severe behavioral complications, when Defendant Holt knew that such representations were false and misleading and created a high likelihood that Plaintiffs would misunderstand K.R.'s profile and needs.

230. Defendant Holt made such representations, as set forth above, while in the conduct of the business of providing adoption services.

231. Defendant Holt therefore conducted unfair business practices and consumer fraud in the business of providing adoption services and engaged in the fraudulent business activities herein alleged to further its pecuniary interest by collecting payment for an adoptive placement that Defendant Holt knew to be contrary to Plaintiffs' (and K.R.'s) interests.

232. Under the UTPCPL, Plaintiffs are entitled to recover treble damages as well as their attorney's fees as a result of Defendant Holt's conduct.  73 P.S. § 201-9.2(a).

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a.    Damages in an amount in excess of $75,000, exclusive of interest and costs;

b.    Damages pursuant to 73 P.S. § 201-9.2(a); and

c.    Attorneys' fees and such other relief as the Court finds just and proper.

## TENTH CAUSE OF ACTION

### NEGLIGENCE

233.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 232 as though fully set forth herein.

234.    Defendant Holt owed a duty to provide Plaintiffs, as K.R.'s prospective adoptive parents, with truthful, complete, and accurate records and information pertaining to K.R.'s background, including but not limited to K.R.'s medical history, psychological profile, behavioral history, and history of abuse, that was in Defendant Holt's possession or control or that was reasonably available to Defendant Holt in a reasonable amount of time.

235.    Defendant Holt breached its duty to provide such truthful, complete, and accurate information and records to Plaintiffs, as K.R.'s prospective adoptive parents.

236.    Defendant Holt negligently failed to fulfill its duty to provide such truthful, complete, and accurate information and records to Plaintiffs, as K.R.'s prospective adoptive parents.

237.    Defendant Holt's negligence was the proximate cause of damages and injuries suffered by Plaintiffs (and K.R.) in that Plaintiffs entered into the adoption/placement process without material information necessary to make informed decisions regarding K.R.'s care and needs, incurred significant and unforeseen financial, emotional, and psychological burdens as a

52

result, and K.R. suffered harm that could have been mitigated or avoided had Defendant Holt fulfilled its duty.

238. Defendant Holt is liable to Plaintiffs for the damages and injuries suffered by them.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a. Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b. Punitive damages; and

c. Attorneys' fees and such other relief as the Court finds just and proper.

<u>**ELEVENTH CAUSE OF ACTION**</u>

**NEGLIGENT PLACEMENT OF ADOPTIVE CHILD**

239. Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 238 as though fully set forth herein.

240. Defendant Holt negligently misrepresented, concealed, and/or failed to disclose to Plaintiffs material information concerning K.R.'s background, including but not limited to K.R.'s medical history, psychological profile, behavioral history, and history of abuse.

241. Plaintiffs justifiably and reasonably relied on the aforementioned negligent misrepresentations and omissions by Defendant Holt.

242. But for Defendant Holt's aforementioned negligent misrepresentations and omissions, Plaintiffs would neither have pursued the adoption of, nor accepted their placement with, K.R.

243. As a direct and proximate result of the aforementioned negligence of, including negligent misrepresentations and omissions by, Defendant Holt, Plaintiffs have suffered, and will

53

continue to further suffer, damages, including but not limited to, the costs of past, present, and future medical and psychological care and treatment for K.R., loss of income, extreme emotional distress, and psychological care and treatment for themselves.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

      a.      Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

      b.      Punitive damages; and

      c.      Attorneys' fees and such other relief as the Court finds just and proper.

**TWELFTH CAUSE OF ACTION**

**WRONGFUL ADOPTION**

244.    Plaintiffs incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 243 as though fully set forth herein.

245.    Defendant Holt had a duty, by operation of law and/or assuming the same, to place K.R. with a family that could cope and handle K.R.'s known health, medical, psychological, and behavioral issues.

246.    At the time Defendant Holt made the aforementioned statements and representations referenced throughout this Complaint regarding K.R.'s medical history, psychological profile, and behavioral history, and/or prior to K.R.'s placement with Plaintiffs, Defendant Holt knew or should have known that such statements, representations, and omissions were false, inaccurate, misleading, and/or materially incomplete.

247.    Defendant Holt knew or should have known that Plaintiffs were not prepared for nor did they wish to adopt or be placed with a child with severe and extreme medical,

54

psychological, and/or behavioral issues, such as those referenced throughout this Complaint regarding K.R.

248.    Despite knowing this, Defendant Holt failed to disclose to Plaintiffs information concerning K.R.'s severe and extreme medical, psychological, and/or behavioral issues.

249.    With the intent to deceive Plaintiffs regarding the history, background, and profile of K.R., Defendant Holt made statements and representations, and omitted material facts and information, in its communications with Plaintiffs as alleged throughout this Complaint.

250.    The actions and omissions of Defendant Holt evidenced a deliberate and willful desire to further Defendant Holt's own interest and business objectives at the expense of Plaintiffs (and K.R.).

251.    Defendant Holt exhibited a reckless, if not intentional, disregard for the interests (and safety) of Plaintiffs (and K.R.).

252.    Plaintiffs reasonably relied on Defendant Holt to provide complete and truthful information and to make honest, transparent, and complete statements and representations regarding K.R.'s health, medical, psychological, and behavioral profile.  Plaintiffs so relied because Defendant Holt was K.R.'s adoption specialist and agent and had a fiduciary duty both to K.R. and to Plaintiffs concerning K.R.'s adoptive placement.

253.    Plaintiffs' reliance on Defendant Holt to provide truthful, complete, and accurate information was reasonable and justified.

254.    But for Defendant Holt's omissions and aforementioned false, inaccurate, misleading, and/or materially incomplete statements and representations regarding K.R., Plaintiffs would not have been placed with a child for whom they were incapable of caring or providing.

255.   As a direct and proximate result of the false, inaccurate, misleading, and/or materially incomplete statements and representations of Defendant Holt, and Defendant Holt's omissions, Plaintiffs have suffered, and will continue to further suffer, damages, including but not limited to, the costs of past, present, and future medical and psychological care and treatment for K.R., loss of income, extreme emotional distress, and psychological care and treatment for themselves.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant Holt and award to Plaintiffs:

a.   Compensatory damages in an amount in excess of $75,000, exclusive of interest and costs;

b.   Punitive damages; and

c.   Attorneys' fees and such other relief as the Court finds just and proper.

Dated: September 5, 2025

Respectfully submitted,

/s/

A. Spencer Osborne (Pa. I.D. 336574)
Glenn F. Rosenblum (Pa. I.D. 23770)
**MONTGOMERY, McCRACKEN, WALKER &
RHOADS, LLP**
1735 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
(215) 772-1500
sosborne@mmwr.com
grosenblum@mmwr.com

*Counsel for Plaintiffs Benjamin T. Irwin
and Angela M. Colasanti*

**CERTIFICATE OF SERVICE**

I, A. Spencer Osborne, hereby certify that on this 5th day of September, 2025, I caused a copy of the foregoing Complaint to be electronically filed with the Clerk of Court by using the electronic filing system.


*/s/ A. Spencer Osborne*
A. Spencer Osborne, Esq.